IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

————————————

**STATE OF ARIZONA,**
*Appellee,*

*v.*

**CHRISTOPHER MICHAEL MONTOYA,**
*Appellant.*

————————————

No. CR-22-0106-AP
Filed August 15, 2024

————————————

Appeal from the Superior Court in Maricopa County
The Honorable Michael W. Kemp, Judge
No. CR2017-006253-001
**AFFIRMED**

————————————

COUNSEL:

Kristin K. Mayes, Arizona Attorney General, Jason D. Lewis (argued), Deputy Solicitor General/Section Chief of Capital Litigation, Phoenix, Jason P. Gannon, Assistant Attorney General Capital Litigation Section Chief Counsel, Capital Litigation Section, Tucson, Attorneys for State of Arizona

Steve Koestner, Office of the Legal Advocate, Kerri L. Chamberlin, Michelle DeWaelsche (argued), Deputy Legal Advocates, Phoenix, Attorneys for Christopher Michael Montoya

————————————

JUSTICE BOLICK authored the Opinion of the Court, in which CHIEF JUSTICE TIMMER, VICE CHIEF JUSTICE LOPEZ, and JUSTICES BRUTINEL, BEENE, KING, and PELANDER joined.[*]

———————

JUSTICE BOLICK, Opinion of the Court:

**¶1**　　　This appeal arises from Christopher Montoya's convictions and sentences for first degree murder, second degree burglary, kidnapping, aggravated identity theft, unlawful use of means of transportation, theft, and two counts of animal cruelty. For the murder offense, Montoya was sentenced to death. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031 and -4033(A)(1). We affirm Montoya's convictions and sentences.

## BACKGROUND

**¶2**　　　As a juvenile, Montoya received multiple referrals for reckless burning, possession of marijuana and drug paraphernalia, and unlawful use of a motor vehicle. As an adult, Montoya was convicted of vehicle theft, possession of a stolen checkbook, possession of burglary tools, second degree burglary, and aggravated assault. Montoya served two prison terms and was placed on probation numerous times in connection with his convictions. Additionally, Montoya abused marijuana and Coricidin, an over-the-counter cough-and-cold medication, throughout his life and around the times he committed the crimes at issue in this case.

**¶3**　　　In April 2017, Montoya met A.R. on a dating app. Almost immediately after they started dating, Montoya brought his belongings to A.R.'s house and frequently stayed the night there. But in June 2017, A.R. broke up with Montoya after she discovered that he was still using dating apps to connect with other women.

**¶4**　　　The day after she broke up with Montoya, A.R. changed her door locks and garage code and took her garage door remote back from

———————

[*] Justice William G. Montgomery is recused from this matter. Pursuant to article 6, section 3 of the Arizona Constitution, Justice John Pelander (Ret.) of the Arizona Supreme Court was designated to sit in this matter.

him.  In the months that followed, Montoya repeatedly called and texted A.R., and he often parked outside A.R.'s house and waited for her. Montoya's refusal to leave A.R. alone made both A.R. and her family nervous.  A.R. considered obtaining a restraining order against Montoya, but she was scared to contact the police or take other action against him

¶5         On October 13, 2017, Montoya broke into A.R.'s house and waited in the dark for her to return.  When A.R. arrived home that evening, Montoya attacked her.   At some point during the attack, Montoya handcuffed A.R.'s hands behind her back, tied her feet together with a belt, and took her to the master bedroom.  Then, Montoya tortured A.R. with a knife.  Montoya extracted from A.R. her passwords and pin codes for her cell phone, debit card, and email account.  Then, Montoya killed A.R. by hitting her in the head with a hammer at least fourteen times.  After killing her, Montoya wrapped A.R.'s body in a comforter and several tarps secured by bungee cords and ropes, and he placed her on the floor in the master bathroom.  Montoya also killed one of A.R.'s dachshunds by covering him with a pillow and lying on top of him until he was smothered, although it is not clear if he did this before or after he killed A.R.  Montoya placed the dog's dead body in a dog crate in the master bathroom with A.R.'s other, still living, dog.

¶6         During the week following the fatal attack, Montoya made several purchases through A.R.'s Amazon account and used her debit card to make purchases throughout Phoenix.  Montoya spent approximately $13,713 of A.R.'s money before he was apprehended.  He also removed most of A.R.'s personal belongings from her home.  Additionally, Montoya drove around in A.R.'s vehicle.

¶7         To evade suspicion, Montoya used A.R.'s phone to text A.R.'s family, friends, and coworkers.  A.R.'s loved ones became suspicious because the text messages were atypical.  On October 24, 2017, A.R.'s family and friends requested a welfare check for A.R., and police discovered A.R.'s body.  A.R.'s back door was shattered, the walls were covered in blood spatter, and a substantial amount of blood was on the master bed.  Police also discovered A.R.'s living dog trapped in the crate, on the brink of death himself, with his dead companion.  Montoya quickly became the primary suspect in A.R.'s murder.

**¶8**        The State indicted Montoya on first degree murder, second degree burglary, kidnapping, aggravated identity theft, unlawful use of means of transportation, theft, and two counts of animal cruelty.  Roughly three years into the case, Montoya pleaded guilty to the charges in the indictment.  He also admitted to two capital aggravators: that he committed previous serious offenses and that he murdered A.R. in an especially cruel and especially heinous manner.  Montoya waived the presentation of mitigation evidence, except he permitted his attorneys to submit the records of his guilty pleas and mitigation waiver hearings as evidence of acceptance of responsibility.  He also agreed his attorneys could cross-examine witnesses called by the State and, during closing argument, argue for any mitigating circumstances that arose during cross–examination.

**¶9**        After the penalty phase of the trial, the jury returned a death verdict.  The court sentenced Montoya to death for the first degree murder of A.R. and to a combined 103 years in prison for the seven non-capital counts.  This automatic appeal followed.

## DISCUSSION

### A. Prosecutorial Error

**¶10**        Montoya argues the prosecutor committed persistent and pervasive errors that denied him the rights to due process, to a fair trial, and to be free from arbitrary and capricious punishment.  "Typically, we review each alleged incident individually for error, after which we decide whether the cumulative effect of any errors we find 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *State v. Robinson*, 253 Ariz. 121, 143 ¶ 64 (2022) (quoting *State v. Payne*, 233 Ariz. 484, 511 ¶ 106 (2013)).  To that end, a defendant must demonstrate that "(1) [error] exists and (2) 'a reasonable likelihood exists that the [error] could have affected the jury's verdict, thereby denying [the] defendant a fair trial.'"  *State v. Morris*, 215 Ariz. 324, 335 ¶ 46 (2007) (quoting *State v. Anderson*, 210 Ariz. 327, 340 ¶ 45 (2005)).  Accordingly, we address each assignment of error in turn.

1. Argument of unproven aggravator

¶11        Montoya claims that the prosecutor erred by arguing an unproven aggravator, specifically the relishing theory of heinousness, during closing argument.  While discussing the moments leading up to A.R.'s death, the prosecutor stated: "One can only imagine the control he had over her and how he may have enjoyed it."  Defense counsel objected for lack of foundation but did not move to strike the statement.  The court sustained the objection.

¶12        The parties dispute whether Montoya's objection preserved the issue for harmless error analysis.  "The purpose of an objection is to permit the trial court to rectify possible error and to enable the opposition to obviate the objection if possible."  *State v. Hoffman*, 78 Ariz. 319, 325 (1955) (internal citation omitted).  If a defendant properly objects to a prosecutor's statement, we review the statement for harmless error.  *State v. Henderson*, 210 Ariz. 561, 567 ¶ 18 (2005).  Under the harmless error standard, we must discern (1) whether the statement was error, and (2) if it was error, whether the State has proven beyond a reasonable doubt that the error did not affect Montoya's sentence.  *See id.*

¶13        "However, raising one objection at trial does not preserve [a different] objection on appeal."  *State v. Long*, 119 Ariz. 327, 328 (1978).  Thus, to preserve the issue of prosecutorial error, defense counsel's objection must have "adequately raise[d] the claim of prosecutorial [error] in the trial court."  *State v. Rutledge*, 205 Ariz. 7, 13 ¶ 30 (2003).  "[W]e will consider a matter on appeal not raised below [only] if it is a matter of fundamental error."  *State v. Vickers*, 129 Ariz. 506, 510 (1981).  "A defendant establishes fundamental error by showing that (1) the error went to the foundation of the case, (2) the error took from the defendant a right essential to his defense, *or* (3) the error was so egregious that he could not possibly have received a fair trial.  If the defendant establishes fundamental error under prongs one or two, he must make a separate showing of prejudice . . . ."  *State v. Escalante*, 245 Ariz. 135, 142 ¶ 21 (2018).

¶14        We need not decide if Montoya's objection was sufficient to preserve this issue for harmless error analysis.  The prosecutor did not commit error.

**¶15**    Prosecutors "are ordinarily given wide latitude in closing argument." *State v. Leon*, 190 Ariz. 159, 162 (1997). A "prosecutor may argue the facts and reasonable inferences from the evidence at the penalty phase," *State v. Cota*, 229 Ariz. 136, 151 ¶ 80 (2012), but "it is improper to argue a non-alleged aggravating circumstance," *State v. Nelson*, 229 Ariz. 180, 189 ¶ 40 (2012).

**¶16**    Capital aggravators are listed in A.R.S. § 13-751(F) (2012),[1] and they include that "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner," § 13-751(F)(6). Because the (F)(6) aggravator is written in the disjunctive, the State need only establish that the murder was especially heinous *or* especially cruel *or* especially depraved to support a finding of the aggravating circumstance. *State v. Gretzler*, 135 Ariz. 42, 51 (1983). The (F)(6) aggravator may be counted only once, but a finding of two or more of the (F)(6) factors may increase the weight accorded to the aggravator. *State v. Miller*, 186 Ariz. 314, 327 (1996).

**¶17**    There are numerous facts that support a finding of heinousness, including "the infliction of gratuitous violence on the victim," which Montoya admitted, and "the apparent relishing of the murder by the killer," which Montoya did not admit. *See Gretzler*, 135 Ariz. at 52. To establish relishing, the State must establish "that the defendant sa[id] or d[id] something, other than the commission of the crime itself, to show he savored the murder." *State v. Roscoe*, 184 Ariz. 484, 500 (1996).

**¶18**    Here, the prosecutor did not argue relishing as an unproven aggravator. As an initial matter, the prosecutor's statement did not even reference facts that could be used to support a finding of relishing because the prosecutor did not assert Montoya did something, other than the commission of the crimes themselves (which is not enough to prove relishing), that showed he savored murdering A.R. Moreover, although the prosecutor said Montoya "may have enjoyed" the control he exercised over A.R. in relation to *kidnapping* her, the prosecutor did not suggest he savored *murdering* her.

---

[1] All references to § 13-751 refer to the 2012 version, the version in effect at the time of Montoya's penalty phase and sentencing.

**¶19**　　　　Even if the prosecutor's statement did reference facts that would support a finding of relishing, merely referencing a fact that could be used to support the (F)(6) aggravator does not always amount to alleging an unproven aggravator. *Nelson*, 229 Ariz. at 189–90, ¶¶ 40–41. In *Nelson*, the prosecutor described the victim as "a helpless victim" and asked "why did [the defendant] have to kill [the victim]?" *Id.* at 189 ¶ 40. We rejected the defendant's contention that the prosecutor argued an unproven aggravator, reasoning that "[a]lthough 'helpless' and 'senseless' are terms used to describe the (F)(6) aggravator, the prosecutor did not suggest its existence by using these words, nor did she argue that such an aggravator be considered." *Id.* at 190 ¶ 41. Moreover, "the jury was unaware of the legal significance of these words because the State did not allege and the court did not instruct on the (F)(6) aggravator." *Id.* Like in *Nelson*, the jury in this case was not aware of the legal significance of relishing because the prosecutor did not argue that the jury should consider relishing as an aggravating factor, and the court did not instruct the jury on relishing as an aggravating factor. Thus, the prosecutor's statement did not constitute arguing an unproven aggravator. There was no error.

**¶20**　　　　Even if the prosecutor had argued an unproven aggravator, Montoya could not show that the error "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Robinson*, 253 Ariz. at 143 ¶ 64 (quoting *Payne*, 233 Ariz. at 511 ¶ 106). As discussed above, the jury was unaware of the legal significance of relishing. Additionally, the court sustained Montoya's objection to the statement and the court instructed jurors that closing arguments were not evidence. *See State v. Moody*, 208 Ariz. 424, 460 ¶¶ 151–52 (2004) (concluding a statement did not require reversal where it "was promptly objected to, and was rendered less harmful by instructions by the court"); *State v. Gallardo*, 225 Ariz. 560, 569 ¶ 40 (2010) (stating that this Court presumes "that jurors follow the court's instructions"). Even Montoya acknowledges that the State "was practically guaranteed a death verdict," in light of his decision to plead guilty, admit two capital aggravators, and present very little mitigation evidence. *See State v. Comer*, 165 Ariz. 413, 427 (1990) ("In light of the overwhelming evidence of [the defendant's] guilt, it is evident that the prosecutor's comments did not contribute to the verdict."). Accordingly, there was no error, and, even if there had been error, such error would not require reversal.

¶21 Montoya also argues the prosecutor's statement caused the (F)(6) aggravator to be broadly construed, and therefore resulted in an arbitrary and capricious death verdict. Although the (F)(6) aggravator is facially vague, it may be constitutionally applied if the jury instructions "provide[] a sufficiently 'narrowed construction.'" *Anderson*, 210 Ariz. at 352–53 ¶¶ 109–14. Here, the jury instructions defined "especially," "especially cruel," and "especially heinous" in a manner that provided a sufficiently narrowed construction. The instructions stated what aggravators Montoya admitted and required the jury to accept those admissions. The jury instructions specified that Montoya admitted that he committed the murder in an especially cruel manner because he caused A.R. to consciously suffer pain, distress, or anguish prior to her death, and that he knew or should have known that she would suffer. The instructions also specified that Montoya admitted that he committed the murder in an especially heinous manner because he inflicted gratuitous violence on A.R. beyond what was necessary to cause her death. The jury was not instructed on the relishing theory of heinousness. The prosecutor's statement did not change the scope or meaning of these instructions. Accordingly, the prosecutor's statement did not result in the imposition of an arbitrary and capricious verdict.

## 2. Appeal to jurors' emotions

¶22 Montoya argues that the prosecutor invited the jury to impose the death penalty based on emotion. In closing argument, the prosecutor stated: "The punishment in this case should reflect the horror, the shock, and the disgust that all of you must have felt when you learned of the cruel death this defendant chose to impose upon [A.R.]." Because Montoya did not object, we review the statement for fundamental error. *See State v. Bocharski*, 218 Ariz. 476, 491 ¶ 74 (2008).

¶23 Prosecutors may not improperly "appeal to the passions and fears of the jury," but they "may comment on the vicious and inhuman nature of the defendant's acts." *Comer*, 165 Ariz. at 426. We approved of a similar prosecutorial statement in *State v. Riley*, 248 Ariz. 154 (2020). There, the prosecutor stated in closing argument: "We can show our outrage at this crime through your verdict. We can show outrage at this crime through the punishment of the defendant." *Id.* at 193 ¶ 154. We concluded "i[t] [was] not clear that [the] statement appealed to the jury's passions at all"

because "[a]n invitation to show 'outrage' at the crime does not invite the jury to punish the defendant on anything other than the evidence presented at trial." *Id.* ¶ 155.

**¶24** Here, the prosecutor's statement that Montoya's punishment should "reflect the horror, the shock, and the disgust" the jurors felt when they "learned of the cruel death [Montoya] chose to impose upon [A.R.]" was a permissible comment on Montoya's "vicious and inhuman" crime, *see Comer*, 165 Ariz. at 426, not an improper appeal to the jurors' passions. The prosecutor's characterization of A.R.'s "cruel death" as horrifying, shocking, and disgusting was germane to the aggravating factor that Montoya murdered A.R. in an especially cruel and especially heinous manner. We also note that the prosecutor immediately followed up the statement in question by telling the jurors they "must not be swayed by mere sympathy or emotion." Thus, the statement did not invite the jury to punish Montoya based "on anything other than the evidence presented at trial." *Riley*, 248 Ariz. at 193 ¶ 155. Accordingly, the court did not err by failing to sua sponte strike the statement.

### 3. Use of victim impact statements to argue for death

**¶25** Next, Montoya argues the prosecutor impermissibly used the victim impact statements to argue for death by "parroting" their "running theme" of theft. A.R.'s family members provided victim impact statements which made several references to what Montoya had "taken" or "robbed" from them and "denied" them. These included statements that Montoya took A.R.'s life, their ability to make amends with A.R. after an argument, and their ability to grow their relationship with A.R.; that Montoya robbed A.R.'s family from having her as a great family member; and that Montoya denied A.R. decency in her death. In closing argument, the prosecutor referenced what Montoya "stole" and "took" from A.R. and her family, including A.R.'s life, her moral constituency and dignity, and the ability of A.R.'s family to give her an open-casket funeral. The prosecutor also stated that Montoya assumed A.R.'s identity to prolong his ability to steal A.R.'s money and possessions. Because Montoya did not object, we review for fundamental error. *See Bocharski*, 218 Ariz. at 491 ¶ 74.

**¶26** A murder victim's surviving family members are victims under Arizona's Victims' Bill of Rights. Ariz. Const. art. 2, § 2.1(C); A.R.S.

§ 13-752(S)(2). Victims have a right to be heard at sentencing proceedings and to present victim impact statements. Ariz. Const. art. 2, § 2.1(A)(4); § 13-752(R). Although victims are permitted to provide victim impact statements, "they may not offer any opinion or recommendation about an appropriate sentence." Ariz. R. Crim. P. 19.1(e)(3); *see also Lynn v. Reinstein*, 205 Ariz. 186, 191 ¶ 17 (2003) (holding the Eighth Amendment bars victims from offering sentencing recommendations).

**¶27** "Because the jury may consider victims' statements in making its sentencing decision, the prosecutor may discuss them in his closing argument." *State v. Roque*, 213 Ariz. 193, 225 ¶ 132 (2006), *abrogated in part on other grounds by State v. Escalante-Orozco*, 241 Ariz. 254 (2017); *see also Payne v. Tennessee*, 501 U.S. 808, 827 (1991) (holding a prosecutor may use victim impact statements to argue for death); *State v. Hulsey*, 243 Ariz. 367, 391–92 ¶¶ 108–11 (2018) (holding prosecutor's recitation of victim impact statement was "not unduly prejudicial and no fundamental error occurred").

**¶28** Here, it is not even clear that the prosecutor referenced the victim impact statements. The prosecutor's reference to Montoya's stealing and taking from A.R. and her family were common ways to describe Montoya's crimes and the harm he caused. A.R.'s family members' references to what Montoya robbed and took from them and denied them did not preempt the prosecutor from using those terms. To the extent the prosecutor did reference the victim impact statements, the prosecutor was permitted to do so. *See Roque*, 213 Ariz. at 225 ¶ 132; *Hulsey*, 243 Ariz. at 391–92 ¶¶ 108–11; *Payne*, 501 U.S. at 827. The prosecutor's statements were supported by the evidence—Montoya did in fact take A.R.'s life and dignity, and he stole her identity, money, vehicle, phone, and other personal belongings. *See Cota*, 229 Ariz. at 151 ¶ 80 (stating that a "prosecutor may argue the facts and reasonable inferences from the evidence at the penalty phase"). We do not find error, much less fundamental error.

### 4. Use of comparative life arguments

**¶29** Montoya argues that the prosecutor erred by making improper comparative life arguments. At closing argument, the prosecutor stated: "When you hear the word mercy, think of the mercy that the

defendant showed [A.R] in her last moments. How he must have looked down on her with each blow, inflicting pain and death." Additionally, in her victim impact statement, A.R.'s sister explained that she and A.R. had argued the last time that they spoke and now could not make amends, and the sister also recounted A.R.'s thirty-second birthday. Then in closing argument, the prosecutor stated: "A life sentence in this case will guarantee [Montoya] birthdays, talking to loved ones, having visitations, and resolv[ing] any unresolved issues with family and friends." Because Montoya did not object, we review for fundamental error. *See Bocharski*, 218 Ariz. at 491 ¶ 74.

¶30 Prosecutors are permitted to draw comparisons between a defendant and a victim. *See, e.g.*, *Roque*, 213 Ariz. at 225 ¶ 133. However, "[c]ourts in other states have found that comparative life arguments are improper and constitute grounds for reversal." *State v. Allen*, 248 Ariz. 352, 365 ¶ 49 (2020). A comparative life argument is an argument that asks the jury to value the defendant's and victim's lives and weigh those values against each other when determining the appropriate punishment. We have never decided whether comparative life arguments are proper, *see Roque*, 213 Ariz. at 225 ¶ 133, and we decline to decide the issue today because the prosecutor in this case did not make a comparative life argument.

¶31 We have upheld similar statements of comparison made by prosecutors in closing argument. For example, in *Roque*, the prosecutor compared the defendant and the victim but stopped short of making a value comparison: "Defendant worked numerous years in the American aircraft industry. That's true. That's true. [The victim] worked a number of years in this country driving a cab [and] working behind the counter of a store. The defendant is married. [The victim] was married." *Id.* at 224 ¶ 131 (second alteration in original). We determined that we did not need to "decide whether a prosecutor's statement comparing the value of the life of the defendant with that of the victim is proper because in [that] case the prosecutor stopped before making a value argument. He summarized evidence that both [the defendant] and [the victim] worked and were married. This was a comparison of the two, but not a valuation of the two." *Id.* at 225 ¶ 133.

¶32　　　　Here, the prosecutor merely summarized the brutality Montoya inflicted on A.R. and the opportunities that would be afforded to Montoya through a life sentence.  She did not link these opportunities to ones lost by A.R.  The prosecutor made no reference to the respective values of A.R.'s and Montoya's lives and did not encourage the jury to weigh the values of their lives against one another.  Thus, we do not find error, much less fundamental error.

　　　　　5.　Use of mitigation as non-statutory aggravation

　　　　　　　a.　Acceptance of responsibility

¶33　　　　Montoya argues the prosecutor erred by using his acceptance of responsibility as a non-statutory, aggravating circumstance.  Roughly three years into the case, Montoya pleaded guilty to the indictment without the benefit of a plea agreement.  Although Montoya generally waived the presentation of mitigation evidence, he permitted his attorneys to submit the records of his guilty plea and mitigation waiver hearings as evidence of his acceptance of responsibility, a mitigating circumstance.  In closing argument, the prosecutor argued that the jury should not give much weight to Montoya's acceptance of responsibility in light of the overwhelming evidence of his guilt.  The prosecutor also intimated that Montoya's acceptance of responsibility could have been disingenuous, rhetorically asking: "Or was this a calculated decision by the defendant, knowing that it could be argued by his lawyers as mitigating?"  Additionally, the prosecutor referenced testimony that stated that defendants often plead guilty in exchange for more lenient sentences.  Because Montoya did not object, we review for fundamental error.  *See Bocharski*, 218 Ariz. at 491 ¶ 74.

¶34　　　　"Acceptance of responsibility is a non-statutory mitigating circumstance, and the trial court is constitutionally required in capital cases to admit proffered evidence of this aspect of a defendant's character." *Busso-Estopellan v. Mroz*, 238 Ariz. 553, 554 ¶ 6 (2015) (internal citations omitted).  "[T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).  Due process prohibits a

jury from considering a mitigating circumstance as a non-statutory aggravating circumstance. *See Zant v. Stephens*, 462 U.S. 862, 885 (1983).

¶35 However, "[o]nce the jury has heard all of the defendant's mitigation evidence, there is no constitutional prohibition against the State arguing that the evidence is not particularly relevant or that it is entitled to little weight." *Anderson*, 210 Ariz. at 350 ¶ 97; *see also State v. Johnson*, 247 Ariz. 166, 187 ¶ 54 (2019) ("The State may rebut the motivation of the plea offers by showing that some motivating factor compelled the plea offer other than remorse or an acceptance of responsibility."). "A prosecutor may properly urge the jury to give more weight to a defendant's crimes than to the mitigation evidence." *State v. Goudeau*, 239 Ariz. 421, 468 ¶ 212 (2016).

¶36 Here, the prosecutor's argument that Montoya's acceptance of responsibility was entitled to little weight in light of the overwhelming evidence of guilt was proper. Additionally, it was reasonable for the prosecutor to question whether Montoya's acceptance of responsibility was calculated as mitigation evidence or a true expression of responsibility for his crimes. Montoya pleaded guilty around three years into the case. Although Montoya argues that he did not know his guilty plea could be used as mitigation, evidence to the contrary exists. Specifically, he permitted his attorneys to submit the transcript of his guilty plea as mitigation, and he even participated in a second mitigation-waiver colloquy to record a video that he could play for the jury.

¶37 Also, the prosecutor's reference to testimony stating that defendants often plead guilty in exchange for a more lenient sentence was proper because, although Montoya did not receive a plea agreement in this case, the statement was relevant to Montoya's argument that his decision to plead guilty in prior criminal cases demonstrated that he always accepted responsibility for his crimes. Thus, the statements were not error.

### b. Family ties

¶38 Montoya also argues the prosecutor erred by using Montoya's abandonment by his biological and adoptive fathers and his having a daughter as non-statutory, aggravating circumstances. In closing argument, the prosecutor argued that the fact that Montoya's biological and

adoptive fathers abandoned him was entitled to little weight as mitigating evidence because he had abandoned his own daughter; further, his having a daughter was entitled to little weight as a mitigating circumstance because he had no relationship with her. Because Montoya did not object, we review these statements for fundamental error. *See Bocharski*, 218 Ariz. at 491 ¶ 74.

**¶39** A defendant's family ties and abandonment by his family are mitigating circumstances. *State v. Moore*, 222 Ariz. 1, 22 ¶ 134 (2009); *State v. Dann*, 220 Ariz. 351, 375 ¶ 137 (2009). As we have already discussed, the State may argue that mitigating "evidence is not particularly relevant or that it is entitled to little weight." *Anderson*, 210 Ariz. at 350 ¶ 97. Here, the prosecutor's statements were proper rebuttal to Montoya's mitigation arguments.

### 6. Misstatement of law

**¶40** Montoya argues the prosecutor misstated the law on mitigation during closing argument. The prosecutor stated: "If you find a fact or circumstance to be nothing more than an excuse or a justification for the murder, then it isn't mitigating." The jury instructions provided: "Mitigating circumstances are not an excuse or justification for the offense, but are factors that in fairness or mercy may reduce the defendant's moral culpability." Because Montoya did not object, we review for fundamental error. *See Bocharski*, 218 Ariz. at 491 ¶ 74.

**¶41** A prosecutor "may not misstate the law to the jury." *State v. Serna*, 163 Ariz. 260, 266 (1990). But a prosecutor may rephrase the jury instructions if doing so does not create a conflict with the court's instructions. *State v. Allen*, 253 Ariz. 306, 359 ¶¶ 198–99 (2022). We previously found no error where a prosecutor restated a mitigation jury instruction in a manner almost identical to how the prosecutor restated the instructions in this case. *Id.* In *Allen*, the prosecutor stated in closing argument: "[I]f you find a fact or circumstance that was offered to be nothing more than an excuse or a justification for the murder, then it isn't mitigating." *Id.* ¶ 198. We held the statement was not error "in light of the jury's other instructions on mitigation" and because "[a]lthough the statement may have rephrased the jury instruction's standard, it did not necessarily conflict with the instructions' clarification that mitigating

circumstances are *not* an excuse or justification for the crime." *Id.* ¶ 199. We do not find error, much less fundamental error.

7. Vouching

**¶42** Montoya argues the prosecutor engaged in improper vouching in relation to a detective's testimony. On direct examination, the prosecutor asked the detective whether cell phone activity evidence in the case was overwhelming, and the detective answered that it was "the largest amount that [he] ha[d] seen in 25 years." Then in closing argument, the prosecutor referenced the detective's characterization of the evidence as "the largest amount" he had seen. Because Montoya did not object, we review for fundamental error. *See Bocharski*, 218 Ariz. at 491 ¶ 74.

**¶43** There are two forms of prosecutorial vouching: "(1) where the prosecutor places the prestige of the government behind its witness; [or] (2) where the prosecutor suggests that information not presented to the jury supports the witness's testimony." *State v. Vincent*, 159 Ariz. 418, 423 (1989). Montoya alleges the prosecutor's statements constitute the latter. This "type of vouching involves prosecutorial remarks that bolster a witness's credibility by reference to matters outside the record." *State v. King*, 180 Ariz. 268, 277 (1994) (internal quotation mark omitted) (quoting *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980)). Here, the prosecutor did not make a "reference to matters outside the record" to support the detective's testimony. *Id.* Thus, the prosecutor did not engage in improper vouching.

**¶44** Montoya also argues that the prosecutor engaged in improper vouching in her questioning of a forensic anthropologist. Multiple medical professionals examined A.R.'s body. One professional noted fourteen head injuries, whereas another professional noted eight. In response to questioning by the prosecutor, the forensic anthropologist explained that the medical professionals used different techniques to reach their conclusions. She also explained that the professional who reported fourteen head injuries was a specialist at identifying impact sites, whereas the professional who noted eight head injuries was a generalist. Because Montoya did not object, we review for fundamental error. *See Bocharski*, 218 Ariz. at 491 ¶ 74.

**¶45** Montoya alleges the prosecutor placed the prestige of the government behind the medical professional that reported fourteen head injuries because her questioning "involve[d] personal assurances of [the medical professional's] veracity." *See King*, 180 Ariz. at 277 (internal quotation mark omitted) (quoting *Roberts*, 618 F.2d at 533). But the prosecutor did not place the prestige of the State behind this witness. The prosecutor did not make any personal assurances about the forensic anthropologist's background. Instead, the prosecutor asked the forensic anthropologist to educate the jury on how different medical experts, applying different methods, could report a different number of impact sites. The prosecutor's questioning was proper solicitation of "cold" expert testimony. *See State v. Salazar-Mercado*, 234 Ariz. 590, 591 ¶ 1 (2014) ("'[C]old' expert testimony . . . educates the fact-finder about general principles without considering the particular facts of the case."). Thus, the prosecutor did not engage in improper vouching.

### 8. Solicitation of character evidence

**¶46** Montoya argues the prosecutor erred by questioning Larry Binkley, Montoya's uncle, about the crimes Montoya committed against him and about Montoya's character. We review "a trial court's admission of evidence during the penalty phase for abuse of discretion." *State v. Champagne*, 247 Ariz. 116, 142 ¶ 87 (2019). "The threshold for relevance is a low one . . . ." *Roque*, 213 Ariz. at 221 ¶ 109. Because Montoya did not object, we review any abuse of discretion for fundamental error. *See Bocharski*, 218 Ariz. at 491 ¶ 74.

**¶47** The scope of mitigation rebuttal evidence is broad. Section 13-752(G) provides:

> At the penalty phase, the defendant and the state may present any evidence that is relevant to the determination of whether there is mitigation that is sufficiently substantial to call for leniency. In order for the trier of fact to make this determination, *regardless of whether the defendant presents evidence of mitigation*, the state may present *any* evidence that demonstrates that the defendant should not be shown leniency including any evidence regarding the *defendant's character*, propensities, *criminal record or other acts*.

(Emphasis added); *see also* § 13-751(G) ("The trier of fact shall consider as mitigating circumstances any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense . . . .").

**¶48** Under §§ 13-752(G) and -751(G), rebuttal evidence need not be relevant to the mitigation evidence proffered by the defendant. *Champagne*, 247 Ariz. at 142 ¶ 90. The statutes plainly provide that evidence relating to a defendant's character is relevant rebuttal evidence. *Id.* ¶ 89. Additionally, "[f]acts underlying a prior criminal conviction are relevant to show that a defendant is not entitled to leniency and may be properly admitted when not unduly prejudicial." *Id.* at 143 ¶ 92. For example, in *Champagne*, we held the trial court did not abuse its discretion by admitting testimony from prior victims that discussed the details of the defendant's prior crimes and the victims' resulting injuries and an audio recording of a prior shootout that the defendant was criminally involved in (that included some audio of a victim screaming) because the evidence demonstrated the defendant's character and propensities. *Id.* at 142–45 ¶¶ 91–93, 99–101.

**¶49** Here, Binkley provided proper testimony regarding Montoya's prior crimes and character. This testimony was plainly within the scope of § 13-752(G). Montoya has not demonstrated that the evidence was so unduly prejudicial that its admission violated his due process rights. Thus, the prosecutor's questioning of Binkley was proper.

### 9. Commenting on Montoya's decision not to allocute

**¶50** Montoya argues that the prosecutor impermissibly commented on his decision not to allocute. In closing argument and while discussing the especially cruel and heinous aggravator, the prosecutor stated:

> We also know that [A.R.'s] phone code, debit pin, and password were on a sheet of paper found in the defendant's truck in Mineral County, [Nevada]. When [A.R.] had to give those up, any threats that went along with that, whether smothering Spike, her beloved puppy, had anything to do with giving up that information, we will never know.

17

**¶51**        Then, while arguing that Montoya did not deserve leniency, the prosecutor stated:

> He then chose to get all of her passwords. We don't know how he got them from her. The only witness to him during these moments was [A.R.]. Then the brutal death with the hammer to her head over and over and over again. We don't know why he chose to kill in such a manner. Only he does.
>
> . . . .
>
> We don't know if she pled for mercy or leniency. We don't know what he said to her. We don't know a lot because he did everything he could to get away with this crime and go on living his life.

Because Montoya did not object, we review for fundamental error. *See Bocharski*, 218 Ariz. at 491 ¶ 74. "Although an improper comment on defendant's failure to [allocute] can be harmless error in some cases, in other cases it can be fundamental error." *State v. Hughes*, 193 Ariz. 72, 86 ¶ 63 (1998) (internal citation omitted). "The error can be fundamental whether the comment is direct or indirect." *Id.*

**¶52**        Criminal defendants have a constitutional and statutory right to refuse to allocute. U.S. Const. amends. V, XIV; Ariz. Const. art. 2, § 10; A.R.S. § 13-117(A). A prosecutor's statement that "naturally and necessarily" draws the jury's attention to a defendant's failure to allocute is improper if it (1) "supports an unfavorable inference against the defendant," and (2) operates "as a penalty for [a] defendant's exercise of his constitutional right." *State v. Schrock*, 149 Ariz. 433, 438 (1986); *see also* § 13-117(B). To determine "whether the jury would naturally and necessarily perceive" a comment to be "on the defendant's failure to [allocute]," we examine the comment in context, looking "to the entire record and to the totality of the circumstances." *Rutledge*, 205 Ariz. at 13 ¶ 33.

**¶53**        Here, the prosecutor's statements correctly reflected the fact that many details surrounding A.R.'s death were unknown. The prosecutor properly used A.R.'s family's statements that much of their grief stemmed from the unknown aspects of A.R.'s death to rebut Montoya's acceptance

of responsibility mitigation and to argue for death. *See Payne*, 501 U.S. at 827. The prosecutor's statements also properly called attention to Montoya's deception following his murder of A.R. The statements that it was unknown how Montoya extracted A.R.'s passwords and whether she pled for mercy spoke to a reasonable inference that A.R. likely experienced anguish and suffering during the process, whether through threats or Montoya's killing of her dog. This inference was germane to the strength of the especially cruel aggravator. The statement that it was unknown why Montoya chose to kill A.R. by striking her in the head fourteen times with a hammer—a close and personal manner of killing—highlighted Montoya's indifference to A.R.'s suffering. This statement was also germane to the especially cruel and heinous aggravator. We cannot say the prosecutor's statements were calculated to draw attention to Montoya's failure to allocute, or that the statements operated as a penalty against Montoya for exercising his constitutional right, especially given that guilt and aggravators were established. We do not find error.

### 10. Cumulative effect of prosecutorial error

**¶54**        Montoya argues that the cumulative effect of the alleged errors denied him due process of law and warrants reversal of his death sentence. "We consider whether 'persistent and pervasive' [error] occurred and whether the 'cumulative effect of the [errors] shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant.'" *Gallardo*, 225 Ariz. at 570 ¶ 46 (quoting *Morris*, 215 Ariz. at 335 ¶ 47). Here, we have identified no instances of prosecutorial error. We hold the cumulative effect of the prosecutor's above-board conduct did not deprive Montoya of a fair trial.

## B. Voir Dire

**¶55**        Montoya argues that the court violated his right to a fair and impartial jury by limiting his use of a hypothetical question and asking rehabilitative questions during voir dire. Montoya requested permission to ask the following hypothetical question during voir dire, without mentioning mitigation:

> Imagine that you have been selected to be on a jury for another case where you and your fellow jurors listened to all

the evidence and decided that the defendant was guilty of a first-degree premeditated murder of an innocent victim. The evidence showed the defendant decided to kill the victim and did so. He wasn't intoxicated, insane or intellectually disabled. This wasn't self-defense, in the heat of passion or duress. There was no legal justification. This was a meant-to-do-it, cold blooded killing of an innocent victim and you and the jury found him guilty. How then do you feel about the death penalty as the only appropriate punishment for this guilty murderer?

¶56      The judge ruled that defense counsel could ask potential jurors the hypothetical question only if defense counsel also discussed mitigation. The judge further explained that if he "need[ed] to jump in and clarify or further explain" mitigation that he would do so.

¶57      Potential jurors completed a jury questionnaire. The questionnaire contained the following questions:

96. Do you believe that a person who had pled guilty to First Degree Murder should always be sentenced to death?

□ Yes □ No

Please explain:

97. Will you, for whatever reason, automatically vote for the death penalty for someone convicted of First Degree Murder without considering the evidence about the Defendant's background, propensities, character, criminal records, or the circumstances of the offense?

□ Yes □ No

If yes, please explain:

. . . .

101. If chosen for this jury, you will not decide whether the Defendant is guilty of First Degree Murder because he has taken responsibility and pled guilty.

Would this impact your ability to consider a natural life sentence in any way?

□ Yes □ No

Please explain:

. . . .

103. Do you agree that it would be wrong for a juror to sit through the entire sentencing proceeding and then, for the first time, state during deliberations that regardless of the facts, he or she would never vote for the death penalty, or alternatively, would always vote for the death penalty?

□ Yes □ No

If No, please explain:

**¶58**　　　During voir dire, defense counsel repeatedly posed the hypothetical to potential jurors without mentioning mitigation (although the definition of mitigation was projected onto a visible screen).  Each time, the State objected, and the judge, as promised, asked the potential juror whether the juror would be able to consider mitigation.

**¶59**　　　We review de novo whether Montoya was constitutionally entitled to ask his proposed hypothetical without discussing mitigation. *See State v. Thompson*, 252 Ariz. 279, 293 ¶ 45 (2022).  Because Montoya argued below that he should be allowed to ask his hypothetical question without mentioning mitigation, we review any error for abuse of discretion. *See id.*

**¶60**　　　A criminal defendant has a right to a fair and impartial jury. Ariz. Const. art. 2, §§ 23, 24; U.S. Const. amends. VI, XIV.  Concomitant with this right "is an adequate *voir dire* to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719 (1992).

**¶61**　　　During voir dire for a capital offense, the court must permit inquiry into "whether a potential juror would automatically impose the death penalty upon conviction of the defendant" without giving due consideration to mitigation. *Id.* at 721.  "Any juror who would impose death regardless of the [aggravating and mitigating] facts and circumstances of conviction cannot follow the dictates of law." *Id.* at 735. General questions, like whether a juror will follow the law or be fair and impartial, are inadequate because potential jurors may in good faith

respond affirmatively, despite their unwillingness to consider mitigating evidence. *Id.*

**¶62**        Montoya misrepresents *Morgan*'s holding in suggesting it stands for the proposition that capital defendants have a right to question potential jurors, without mentioning mitigation, on whether they think the death penalty is appropriate upon conviction. Instead, *Morgan* guarantees capital defendants the right to ask questions that illuminate whether potential jurors will refuse to consider mitigation because they have "predetermined" to vote for death regardless of the law and facts. *Id.* at 736; *see also State v. Jones*, 197 Ariz. 290, 303 ¶ 27 (2000) ("*Morgan* recognizes [that] . . . defendants have a right to know whether a potential juror will automatically impose the death penalty once guilt is found, regardless of the law. Thus, defendants are entitled to address this issue during voir dire."); *Thompson*, 252 Ariz. at 294 ¶¶ 48–49 (explaining *Morgan* permits inquiry into "which prospective jurors may have predetermined to impose the death penalty").

**¶63**        We have previously rejected the argument that a court abuses its discretion by requiring a capital defendant "to mention mitigation in a hypothetical question" and interjecting when the defendant fails to do so. *State v. Patterson*, 230 Ariz. 270, 274 ¶ 10 (2012). Here, Montoya's hypothetical paired with a mention of mitigation enabled him to discern whether potential jurors would refuse to consider mitigating evidence. In fact, by requiring Montoya to discuss mitigation when posing the hypothetical, the court ensured Montoya's hypothetical got to the heart of the *Morgan* inquiry. *See State v. Glassel*, 211 Ariz. 33, 46 ¶ 40 (2005) (explaining that questions that do "not address the issue of whether a juror would automatically impose the death sentence regardless of the jury instructions or mitigation evidence" do "not further the *Morgan* inquiry"). Additionally, the juror questionnaire contained questions that fully addressed the *Morgan* issue. Thus, Montoya had an adequate opportunity to participate in voir dire in compliance with *Morgan*. *See State v. Johnson*, 212 Ariz. 425, 435 ¶ 34 (2006) (holding "the trial court clearly complied with *Morgan* requirements" where "the trial court required each potential juror to fill out a 23-page juror questionnaire that fully addressed *Morgan* issues" and the "court also conducted individual *voir dire* of every prospective juror whose responses raised impartiality concerns"); *State v. Smith*, 215 Ariz. 221, 231 ¶ 43 (2007) (holding the court complied with *Morgan* where "[t]he jurors

filled out questionnaires, which contained the *Morgan* question, along with other questions about the death penalty, and [the defendant] had ample opportunity to question potential jurors").

**¶64** Next, Montoya argues the court violated Rule 18.5(f) of the Arizona Rules of Criminal Procedure by asking rehabilitative questions during voir dire. Rule 18.5(f) states in relevant part: "The court retains the discretion to manage voir dire, including to preclude improper, excessive, or abusive questioning." The 2022 comment to Rule 18.5(f) provides: "The court should refrain from attempting to rehabilitate prospective jurors by asking leading, conclusory questions that encourage prospective jurors to affirm that they can set aside their opinions and neutrally apply the law." However, this comment does not "strip away what the rule expressly provides by giving courts 'the discretion to manage voir dire.'" *State v. Fournier*, 256 Ariz. 33, 41 ¶ 13 (App. 2023) (quoting Ariz. R. Crim. P. 18.5(f)), *paragraphs 19–21 depublished in part on other grounds by* 543 P.3d 1034, 2024 WL 1003709, (Ariz. 2024) (mem. decision).

**¶65** Here, the court acted within its discretion in determining that Montoya's hypothetical, without a mention of mitigation, was misleading to potential jurors and by interjecting when defense counsel failed to mention mitigation. *See Johnson*, 247 Ariz. at 197 ¶ 111 (characterizing a "hypothetical that presupposed guilt and an aggravating circumstance, omitted mitigation, and risked implying that a death sentence was required" as "misleading"); *Patterson*, 230 Ariz. at 274 ¶¶ 10–11 (discussing with approval a court's determination that a capital defendant posing a hypothetical without mentioning mitigation "intentionally 'bait[ed]' [potential jurors] into suggesting they would not consider mitigation" (first alteration in original)). A court does not err in properly instructing jurors on the law and forbidding confusing hypothetical questions. *Patterson*, 230 Ariz. at 274 ¶ 12. "Because the trial judge is responsible for ensuring that voir dire is conducted in a manner that results in a fair and impartial jury for both sides, a judge may interject to make certain a juror understands . . . the law on a particular subject, and the question being asked." *Smith*, 215 Ariz. at 231 ¶ 45 (internal citation omitted). Thus, the court complied with Rule 18.5(f).

## C. Juror Designation

### 1. Juror 17

¶66        Montoya argues the court's refusal to strike Juror 17 violated his right to a fair and impartial jury.  On the jury questionnaire, Juror 17 rated his overall opinion of the death penalty at ten, strongly in favor, on a scale of one to ten.  He wrote that he felt the death and natural life penalties should be imposed based on the severity and circumstances of the crime. He also indicated that he agreed with the law regarding mitigating circumstances, he did not believe that people who plead guilty to first degree murder should always be sentenced to death, and he would not automatically vote for the death penalty without considering mitigation.

¶67        During voir dire, defense counsel and Juror 17 had the following exchange:

> [DEFENSE COUNSEL]: Okay. Same hypothetical to you as posed before. Cold-blooded, meant-to-do-it murder of an innocent victim. You considered all the evidence. You considered all the mitigation. How do you feel about the death penalty as the only appropriate penalty of a guilty murderer of an innocent victim?
>
> [JUROR 17]: Well, based on that scenario, everything was pretty clear, cut, and dry. So definitely I would lean towards the death penalty in that case.
>
> [DEFENSE COUNSEL]: A little louder, please.
>
> [THE COURT]: Yeah. I can't hear you, sir. You need to repeat that answer.
>
> [JUROR 17]: I said, based on the scenario that you gave, it was pretty cut and dry with the information you gave, that you would definitely have to lean towards the death penalty, *but not every case is that cut and dry.*
>
> [DEFENSE COUNSEL]: Okay.
>
> [JUROR 17]: *So that's why you have to review the facts and the circumstances before you could make—*

24

[DEFENSE COUNSEL]: Okay. You wrote in your questionnaire that death penalty should be used based on the severity of the crime and natural life based on the circumstances. Can you talk a little bit more about that?

[JUROR 17]: Sure. The circumstances we're talking about, the severity of the crime, based on what I read, it was a pretty severe crime, but based on natural life, as like he indicated there too, *was there circumstances behind it? Was the guy mentally ill? Was he—you know, a passion? Was it a fit of rage because he found out his ex-girlfriend was seeing someone else, or he caught them in the act or whatever it might be? That's what I refer to there.*

[DEFENSE COUNSEL]: Same kind of question to you that I posed to the other jurors. What if those things aren't present?

[JUROR 17]: Good question.

[DEFENSE COUNSEL]: Or what if it takes a different form than—than those—those few details?

[JUROR 17]: *I would have to dissect the details first before I could honestly give you an answer to that.*

[DEFENSE COUNSEL]: Correct me if I'm wrong, but it kind of sounds to me like—like that the severity of the crime weighs a little bit more heavily to you than the circumstances.

[JUROR 17]: Yes.

[DEFENSE COUNSEL]: Okay. So that—that's going to be more important to you?

[JUROR 17]: *No, not based—until I hear everything.*

[DEFENSE COUNSEL]: Okay.

[JUROR 17]: I mean, there might be a reason for the severity. There might not be a reason for the severity, but you asked me a specific question—

[DEFENSE COUNSEL]: I did.

[JUROR 17]: —about the severity, and I gave you an honest answer.

(Emphasis added.)

**¶68** On the juror questionnaire, Juror 17 wrote that the State's decision to seek the death penalty should not be based on whether a defendant accepts responsibility for a crime. He also wrote that he had strong feelings about people who abuse hard drugs, specifically the actions they take to maintain their habits. He wrote that people who abuse over-the-counter medications need to seek help and that he thought marijuana should be legalized.

**¶69** During voir dire, defense counsel and Juror 17 also had the following exchange:

> [DEFENSE COUNSEL]: I appreciate that. Okay. You wrote that you strongly favor the death penalty, and that, even if the person accepts responsibility, it should be no different whether they accept responsibility or are tried. Can you talk about that a little bit?
>
> . . . .
>
> [JUROR 17]: *I didn't say it was—it should be automatic.*
>
> [DEFENSE COUNSEL]: I'm not—I'm not suggesting that you said it was automatic, but you wrote that you favor the death penalty, and that, even if the person accepts responsibility, it should be no different that they accept responsibility or if they're—or if they are tried and found guilty by a jury.
>
> [JUROR 17]: When you say it that way, yes. I mean, I favor the death penalty. *If it's warranted, it should be applied, but circumstances dictate whether it should be applied or not.* That's what the answer is.
>
> [DEFENSE COUNSEL]: So it doesn't matter to you that he accepted responsibility?
>
> [JUROR 17]: *No. It should.*
>
> . . . .
>
> [DEFENSE COUNSEL]: The question that you answered in the—in the questionnaire was about the fact that the defendant accepted responsibility. How do you feel about that?

[JUROR 17]: Well, I mean, if he did accept responsibility, then all of the circumstances or information leading up to it, yeah, you would definitely—what's the word I want to use—not favor but, you know, lean towards he accepted it. *Based on what I've read, it was a pretty heinous crime, but I don't know all the answers or all the circumstances around it.*

[DEFENSE COUNSEL]: Okay. But does his acceptance of responsibility, what does that mean to you?

[JUROR 17]: Acceptance of responsibility is that he admitted he's wrong, but in the case that he mentioned too, just because he admitted responsibility, I mean, like does he have, like he said, remorse? *I mean, is there other circumstances?* He just wanted to be done with it? Is there something there where, you know—

[DEFENSE COUNSEL]: Uh-huh. Okay. You didn't check either of the boxes, but there was a question about people who—who use drugs in the questionnaire. And you wrote, those who abuse hard drugs—you put meth, et cetera, in parentheses—and what they could do to keep the habit going. Can you talk a little bit about that?

[JUROR 17]: What was the question?

[DEFENSE COUNSEL]: You were asked a question about how do you feel about people who abuse drugs?

[JUROR 17]: Well, the people that abuse drugs, from what I—

[DEFENSE COUNSEL]: If you need to refer to the questionnaire, that's okay.

[JUROR 17]: No. That's fine. I can—people that use hard drugs, like meth and everything like that, they do a lot of hideous things in order to keep that habit going, whether to rob a store, whether it's to rob someone and kill them, you know, and, at the same time, they're doing that, I mean, you have to take that into a factor, too, is his background, was how many times has he been incarcerated before, you know.

[DEFENSE COUNSEL]: So you're kind of talking about the vicious cycle that goes into that?

[JUROR 17]: Correct, yes.

(Emphasis added.)

**¶70** Defense counsel moved to strike Juror 17 for cause, arguing that Juror 17 presumed death was the appropriate sentence, would weigh the severity of the crime more heavily than mitigation, and would treat substance abuse as aggravation. The court overruled defense counsel's motion. Juror 17 deliberated on the jury that returned Montoya's death verdict.

**¶71** Montoya argues that we should not defer to the court's discretion in deciding motions to strike because Arizona no longer permits peremptory strikes. He similarly argues that, for the same reason, if the decision of whether to strike Juror 17 was a "close call," we should hold the court abused its discretion. We reject these arguments. Arizona's elimination of peremptory strikes did not remove trial courts from being in the best position to assess potential jurors' fairness and impartiality, and it did not alter the abuse-of-discretion standard, which requires affirmance unless the court's action was "clearly untenable, legally incorrect, or amount[ed] to a denial of justice." *State v. Chapple*, 135 Ariz. 281, 297 n.18 (1983), *superseded on other grounds by* A.R.S. § 13–756.

**¶72** Thus, we review the court's refusal to dismiss Juror 17 for cause for abuse of discretion. *See Glassel*, 211 Ariz. at 45 ¶ 36. Because defense counsel objected to Juror 17, we review any error for harmless error. *See Henderson*, 210 Ariz. at 567 ¶ 18.

**¶73** Before beginning our analysis, we pause to clarify the role of the court and counsel during voir dire. Montoya argues that the court had a duty to sua sponte question Juror 17 further, even though Montoya did not request additional voir dire of Juror 17. He asserts this duty spawned when Arizona eliminated peremptory strikes. But "[t]he party challenging a juror for cause"—not the court—"has the burden to establish by a preponderance of the evidence that the juror cannot render a fair and impartial verdict." Ariz. R. Crim. P. 18.5(h). The elimination of peremptory strikes did not shift the burden of proof away from the moving party to the court. The court conducts, controls, and manages voir dire, Ariz. R. Crim.

P. 18.5(f), but it is not required to participate in voir dire in the manner Montoya suggests.

¶74 "The court, on motion or on its own, must excuse a prospective juror or jurors from service in the case if there is a reasonable ground to believe that the juror or jurors cannot render a fair and impartial verdict." Ariz. R. Crim. P. 18.4(b). "In making its determination, the court must consider the totality of a prospective juror's conduct and answers given during voir dire . . . ." Ariz. R. Crim. P. 18.5(h). A criminal defendant has a right to a fair and impartial jury. Ariz. Const. art. 2, §§ 23, 24; U.S. Const. amends. XI, XIV. A juror who would impose death regardless of the aggravating and mitigating evidence is not impartial. *Morgan*, 504 U.S. at 728–29.

¶75 Juror 17's strong opinion in favor of the death penalty did not preclude him from deliberating on the jury. "Simply because a juror favors the death penalty does not . . . necessarily preclude the juror from serving on a jury; if the juror is 'willing to put aside his opinions and base his decisions solely upon the evidence, he may serve.'" *State v. Velazquez*, 216 Ariz. 300, 307 ¶ 19 (2007) (quoting *State v. Martinez*, 196 Ariz. 451, 459 ¶ 28 (2000)); *see also Johnson*, 247 Ariz. at 197 ¶ 109 ("[A] prospective juror is not precluded from serving on the jury simply because he favors the death penalty."). In fact, excusing a juror because of his "views on capital punishment" is structural error that requires reversal, *State v. Ring*, 204 Ariz. 534, 552 ¶ 46 (2003), unless the juror is "irrevocably committed" to vote for or against the death penalty "regardless of the facts and circumstances," *Davis v. Georgia*, 429 U.S. 122, 123 (1976) (internal quotation mark omitted) (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 522 n.21 (1968)); *see also Morgan*, 504 U.S. at 728–29.

¶76 Additionally, we have previously rejected the argument that a potential juror's response that the death penalty is the appropriate penalty under a hypothetical means the potential juror cannot be fair or impartial as explained in *Morgan*. *See Johnson*, 247 Ariz. at 196–97 ¶¶ 107–11. In *Johnson*, potential jurors stated during voir dire that "they could not imagine a situation where the totality of someone's character could warrant mercy" when defense counsel posed a hypothetical of a defendant who was "guilty of intentional premeditated killing of an innocent victim." *Id.* ¶¶ 107–08. We held the court did not abuse its discretion in denying the

defendant's motion to strike those potential jurors because they "all stated they would keep an open mind during the trial, could consider mitigation evidence, and would not automatically vote for the death penalty." *Id.* at 197 ¶¶ 110–11.

¶77 Here, like in *Johnson*, Juror 17 repeatedly and consistently indicated on the juror questionnaire and during voir dire that he would not vote to impose the death penalty automatically upon conviction, that he would consider mitigating evidence, and that he felt whether the death penalty was appropriate depended on the facts and circumstances of each individual case. Indeed, although Juror 17 indicated he would "lean towards" the death penalty under Montoya's hypothetical, he immediately qualified his answer by stating "not every case is that cut and dry" and explaining he would need to examine the facts and circumstances.

¶78 Moreover, Juror 17's responses regarding his feelings surrounding acceptance of responsibility and drug abuse did not indicate that he would view Montoya's mitigating evidence as aggravation. On the juror questionnaire, Juror 17 wrote that acceptance of responsibility should not affect whether the State *seeks* the death penalty—not whether a jury imposes the death penalty. During voir dire, Juror 17 stated the death penalty should not be automatic when the defendant accepts responsibility, and he stressed that the particular facts and circumstances surrounding the acceptance of responsibility would be important to him. Although Juror 17 indicated negative feelings towards individuals who abuse hard drugs and commit crimes to maintain their drug habits, he also stated that he would consider the factors that led a defendant to abuse drugs and would not push his feelings onto other jurors. On the juror questionnaire, Juror 17 wrote that people who abuse over-the-counter medication should seek help and that marijuana should be legalized.

¶79 Ultimately, the "court was in the best position to observe the prospective jurors and determine whether they were impaired." *Johnson*, 247 Ariz. at 197 ¶ 111. Juror 17's repeated affirmations that he would consider all the facts and circumstances and follow the law regarding mitigation demonstrate that Juror 17 was not substantially impaired or unable to perform his duty as a juror. Thus, the court did not abuse its discretion in denying Montoya's motion to strike Juror 17.

2. Juror 6

**¶80** Montoya argues the court abused its discretion by designating Juror 6 as an alternate because there was no reasonable ground to believe she could not render a fair and impartial verdict. Alternatively, Montoya argues the court's designation of Juror 6 as an alternate was structural error because the designation amounted to a for-cause strike.

**¶81** The judge and prosecutor observed Juror 6 repeatedly falling asleep during the presentation of evidence. The judge brought Juror 6 into the courtroom for a colloquy about her difficulty staying awake. Juror 6 apologized for her apparent lack of attention but stated she did not feel like she was falling asleep. Juror 6 also explained she took medication, but that she did not think it made her drowsy during the day.

**¶82** Defense counsel researched Juror 6's medication and informed the court that one of the side effects was rapid blinking. Defense counsel asked the judge if he wanted to question Juror 6 further about her medication and eye blinking, but he declined.

**¶83** After the parties filed written pleadings and made an oral record on Juror 6, the court designated Juror 6 as an alternate. The judge recounted that he had observed Juror 6 sleeping during a "significant" and "important" part of the State's presentation, and that at other times it had appeared like she was having a difficult time staying awake. Additionally, the judge explained his ruling was based solely on his position that neither side could obtain a fair and impartial verdict if a deliberating juror had slept through portions of evidence.

**¶84** We review a court's investigation of juror misconduct and juror dismissal for abuse of discretion. *State v. Davolt*, 207 Ariz. 191, 207 ¶ 56 (2004); *State v. Lavers*, 168 Ariz. 376, 390 (1991). We "will not set aside the trial court's findings of fact unless they are clearly erroneous." *Schade v. Diethrich*, 158 Ariz. 1, 7 (1988). Montoya argues we should not defer to the court's findings of fact because COVID-19 protocols hindered the judge's ability to observe Juror 6. However, the fact that Juror 6 wore a mask covering her nose and mouth did not affect the judge's ability to see Juror 6 closing her eyes and jerking her body. Despite COVID-19 protocols, we still defer to the judge's findings of fact because he remained in the best

position to observe Juror 6. Because Montoya objected to the court's designation of Juror 6 as an alternate, we review any error for harmless error. *Henderson*, 210 Ariz. at 567 ¶ 18.

¶85 Rule 18.4(b) provides: "The court, on motion or on its own, must excuse a prospective juror or jurors from service in the case if there is a reasonable ground to believe that the juror or jurors cannot render a fair and impartial verdict." A reasonable ground for dismissal under Rule 18.4 may arise during trial. *See State v. Trostle*, 191 Ariz. 4, 12–13 (1997).

¶86 We previously held that a court's refusal to dismiss a juror who fell "asleep for a short time" where "no evidence show[ed] that the sleeping juror 'missed large portions of the trial or that the portions missed were particularly critical'" is not reversible error. *State v. Prince*, 226 Ariz. 516, 533 ¶ 57 (2011) (quoting *United States v. Freitag*, 230 F.3d 1019, 1023 (7th Cir. 2000)). But a court does not necessarily abuse its discretion by excusing a sleeping juror. This is especially true where, as here, the juror was observed by the judge sleeping multiple times during the presentation of "significant" and "important" evidence. *See Freitag*, 230 F.3d at 1023 ("If sleep by a juror makes it impossible for that juror to perform his or her duties or would otherwise deny the defendant a fair trial, the sleeping juror should be removed from the jury.").

¶87 Additionally, Juror 6's assurances that she was not sleeping did not override the judge's actual observations of her sleeping. "The conduct of the juror in open court was a matter of which the trial court had judicial knowledge and could take judicial notice." *Cota*, 229 Ariz. at 151 ¶ 74 (quoting *United States v. Curry*, 471 F.2d 419, 422 (5th Cir. 1973)); *see also Brooks v. Zahn*, 170 Ariz. 545, 550 (App. 1991) (noting appellate courts "defer to the trial court's resolution of conflicting evidence with respect to alleged juror misconduct"). Here, the judge's determination that Juror 6 could not be a fair or impartial juror due to her sleeping is supported by the record. Thus, the court had reasonable grounds to excuse Juror 6.

¶88 But instead of excusing Juror 6, the court designated her as an alternate. This violated Rule 18.5(j)(2), which provides: "Just before the jury retires to begin deliberations, the clerk or court official must determine the alternate juror or jurors *by lot or stipulation*." (Emphasis added.) Designating Juror 6 as the alternate was neither by lot nor by stipulation.

However, an errant "designation of alternates by the trial judge does not require reversal in the absence of resulting prejudice." *Cota*, 229 Ariz. at 147 ¶ 44; *see also* Ariz. Const. art. 6, § 27 ("No cause shall be reversed for technical error in pleadings or proceedings when upon the whole case it shall appear that substantial justice has been done."); *State v. Blackhoop,* 162 Ariz. 121, 122 (1989) ("Technical errors in jury selection do not require a new trial."); *State v. Arnett*, 119 Ariz. 38, 50 (1978) ("A defendant in a criminal case is entitled to a fair and impartial jury for the trial of his case, but he is not entitled to be tried by any particular jury; therefore, unless the record affirmatively shows that such a fair and impartial jury was not secured, the conviction must be affirmed."). Here, the court's technical violation of Rule 18.5 does not require reversal because the court unquestionably had the authority to excuse Juror 6. The court's decision to designate her as an alternate instead of excusing her altogether could not have harmed Montoya because Juror 6 did not serve on the jury during deliberations. Montoya has neither argued nor shown that he was deprived of a fair and impartial jury. In sum, the error was harmless.

**¶89**        Next, Montoya argues that the court abused its discretion by refusing his request to voir dire Juror 6 further about whether she suffered from rapid eye blinking as a side effect from her medication. "When a trial court becomes aware of possible juror misconduct, it should 'conduct whatever investigation it deems warranted.'" *Cota*, 229 Ariz. at 150 ¶ 74 (quoting *State v. Cook*, 170 Ariz. 40, 55 (1991)). We have previously rejected the argument that a judge abuses his discretion by declining to voir dire a sleeping juror and instead relying on his personal observations. *Id.* at 150–51 ¶¶ 73–74. Here, it is not clear that additional voir dire would have been of any use. If additional voir dire revealed that Juror 6 did in fact experience rapid eye blinking as a side effect from her medication, the question of whether Juror 6 was sleeping or exhibiting eye-blinking symptoms would have remained unanswered. In any event, the judge relied on both a prior colloquy with Juror 6 as well as his personal observations in designating Juror 6 as an alternate. This satisfied the investigation requirement for juror misconduct. Thus, the court did not abuse its discretion by refusing Montoya's request to voir dire Juror 6 further.

**¶90**        Finally, Montoya argues that the court's designation of Juror 6 as an alternate was effectively a for-cause strike based on her negative

view towards the death penalty and therefore constituted structural error. *See Ring*, 204 Ariz. at 552 ¶ 46; *State v. Anderson*, 197 Ariz. 314, 324 ¶ 23 & n.5 (2000). Excusing a juror because of her "views on capital punishment" is structural error that requires reversal. *Ring*, 204 Ariz. at 552 ¶ 46. Montoya's argument, though, is belied by the record. The court repeatedly denied the State's requests to strike Juror 6 for cause during voir dire. Although the court acknowledged the State did not want Juror 6 to deliberate because of her negative views about the death penalty, the court made clear that its decision to designate Juror 6 as an alternate had nothing to do with her views on capital punishment. The court's sole professed reason for designating Juror 6 as an alternate was because she slept through the presentation of critical evidence, and nothing in the record suggests otherwise. As explained above, there were reasonable grounds to excuse Juror 6. Thus, the court did not deprive Montoya of his constitutional rights by designating Juror 6 as an alternate.

**D. Admission of Photographs**

**¶91**        Montoya argues the court's admission of certain autopsy photographs deprived him of his right to a fair trial because the photographs were irrelevant and unduly prejudicial. The photographs show A.R.'s handcuffed wrists, legs bound with a bungee cord and belt, and injured head. The State published the photographs to the jury in connection with testimony from a forensic anthropologist. The forensic anthropologist referenced the photographs to explain A.R.'s state of decomposition; how tightly A.R. was bound by the handcuffs, bungee cord, and belt; A.R.'s injuries related to the bindings; the possibility that A.R.'s shirt sleeve was cut; and the extent of A.R.'s head injuries.

**¶92**        We generally review the admission of photographs for an abuse of discretion. *See State v. Rushing*, 243 Ariz. 212, 219 ¶ 24 (2017). "Whether the trial court abused its discretion in admitting a photograph turns on (1) the photograph's relevance, (2) its tendency to inflame the jury, and (3) its probative value compared to its potential to cause unfair prejudice." *Cota*, 229 Ariz. at 147 ¶ 46. Before the State moved to admit the autopsy photographs, Montoya filed a general objection to irrelevant, unfairly prejudicial, or duplicative photographs. After the State informed Montoya of the photographs the State intended to use, Montoya objected to nine specific photographs, none of which were the ones he now challenges.

Because Montoya did not object to the admission of the photographs, we review for fundamental error. *Moody*, 208 Ariz. at 455 ¶ 120; *see also State v. Lopez*, 217 Ariz. 433, 434 ¶ 4 (App. 2008) ("[A] general objection is insufficient to preserve an issue for appeal.").

¶93 For his argument, Montoya relies on *Chapple*, where we held a court abused its discretion by admitting photographs during the guilt phase of a trial that depicted the victim's charred body because the photographs' probative value was outweighed by the risk of unfair prejudice. 135 Ariz. at 289–90. But *Chapple* does not definitively decide the issue before us because, here, the photographs were admitted during the penalty phase of Montoya's trial. "The Rules of Evidence do not apply to the admission of evidence during the penalty phase of a capital trial." *State v. Burns*, 237 Ariz. 1, 28 ¶ 130 (2015). Instead, § 13-752(G) governs, which provides:

> At the penalty phase, the defendant and the state may present any evidence that is relevant to the determination of whether there is mitigation that is sufficiently substantial to call for leniency. In order for the trier of fact to make this determination, regardless of whether the defendant presents evidence of mitigation, the state may present any evidence that demonstrates that the defendant should not be shown leniency including any evidence regarding the defendant's character, propensities, criminal record or other acts.

*see also* § 13-751(G) ("The trier of fact shall consider as mitigating circumstances any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense . . . ."). Of course, the court should not admit evidence that is irrelevant or unduly prejudicial during the penalty phase. *Burns*, 237 Ariz. at 29 ¶ 130.

¶94 Here, the photographs were properly admitted under §§ 13-751 and -752 because the circumstances of A.R.'s death were relevant to whether Montoya should be shown leniency. "[T]he fact and cause of death are always relevant in a murder prosecution," even if the defendant does not contest these elements. *Goudeau*, 239 Ariz. at 459 ¶ 154 (quoting

*Chapple*, 135 Ariz. at 288). The photographs showed the "location of [A.R.'s] mortal wounds," showed "how the crime was committed," and aided "the jury in understanding the testimony of [the medical examiner]." *See State v. Mohr*, 106 Ariz. 402, 403 (1970).

¶95 Additionally, the photos were not so unduly prejudicial as to deny Montoya the right to a fair trial. "There is nothing sanitary about murder," and the court may properly admit gruesome photographs at the penalty phase. *See State v. Rienhardt*, 190 Ariz. 579, 584 (1997). "[T]he state cannot be compelled to try its case in a sterile setting." *Chapple*, 135 Ariz. at 289–90. After reviewing all the autopsy photographs, it is clear to us that the State was judicious in selecting the photographs it sought to admit into evidence. The photographs were relatively much less gruesome than others available to the State because they did not show A.R's face or naked body. Moreover, the photographs were not duplicative of one another, and they were not more inflammatory than other photographs we have previously found admissible. *See, e.g.*, *Burns*, 237 Ariz. at 19 ¶¶ 59–62 (holding court did not abuse its discretion by admitting photographs of victim's body as it was discovered in the desert after animals severed the victim's head and photographs of victim's skull); *Goudeau*, 239 Ariz. at 458–60 ¶¶ 150–58 (holding court did not abuse its discretion by admitting photograph of victim with a metal trajectory rod depicting bullet's travel through victim's left hand, neck, and shoulder, a second visible gunshot wound, and visible blood); *Cota*, 229 Ariz. at 147–48 ¶¶ 45–47 (holding court did not abuse its discretion by admitting photographs of victims as they were received by the medical examiner's office and during their autopsies). Thus, we hold that the court did not abuse its discretion by admitting the photographs.

**E. Waiver Of The Presentation Of Mitigation Evidence**

¶96 Montoya argues that the court's acceptance of his partial waiver of the presentation of mitigation evidence violated his constitutional rights. We review questions of constitutional interpretation de novo. *Smith*, 215 Ariz. at 228 ¶ 20.

    1. Eighth Amendment challenge

¶97 Montoya argues the court's acceptance of his waiver of the presentation of most mitigation evidence violated his Eighth Amendment

right to an individualized sentence. "[A] State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death." *Payne*, 501 U.S. at 822 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)). The decision to impose the death penalty must be an "*individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant*, 462 U.S. at 879–78. The requirement for an individualized determination "is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994); *see also Blystone v. Pennsylvania*, 494 U.S. 299, 307 (1990) ("The requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence.").

¶98        Montoya correctly points out that the Supreme Court has not expressly held whether a defendant may waive the presentation of mitigation evidence under the Eighth Amendment. However, "the Supreme Court has suggested that there is no constitutional violation when a defendant chooses to put on no mitigating evidence." *Roscoe*, 184 Ariz. at 499.

¶99        For example, in *Blystone*, the Supreme Court considered the constitutionality of Pennsylvania's death penalty statute, which mandated a verdict of death if the jury found at least one aggravator and no mitigators. 494 U.S. at 301. The defendant did not present any mitigating evidence during the penalty phase of his trial. *Id.* at 306 n.4. The defendant argued the mandatory nature of the statute unconstitutionally prevented the jury from returning an individualized sentence determination. *Id.* at 306. The Court rejected this argument, explaining:

> The requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence. In petitioner's case the jury was specifically instructed to consider, as mitigating evidence, any "matter concerning the character or record of the defendant, or the circumstances of his offense." This was sufficient to satisfy the dictates of the Eighth Amendment.

*Id.* at 307–08 (internal citation omitted); *see also Schriro v. Landrigan*, 550 U.S. 465, 479 (2007) (stating that the Supreme Court has "never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence" and that the Court has "never required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence"); *Burger v. Kemp*, 483 U.S. 776, 794–95 (1987) (holding defense counsel was not "constitutionally compelled" to investigate or present mitigating evidence where he had reasonable reasons not to do so (internal quotation mark omitted) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984))).

**¶100**　　　　Despite the lack of clarity in Supreme Court jurisprudence on the issue, we have repeatedly and consistently held that competent defendants may constitutionally waive the presentation of mitigating evidence, so long as they do so knowingly, voluntarily, and intelligently. *See, e.g.*, *Riley*, 248 Ariz. at 200 ¶ 195. Contrary to Montoya's assertions, such waiver does not prevent the jury from considering mitigating evidence as required by the Eighth Amendment. "[T]he Eighth Amendment requires only that a jury be *allowed* to consider mitigating evidence; it does not require a jury to be presented with that evidence over a defendant's objections." *Id.* ¶ 198; *see also Roscoe*, 184 Ariz. at 499 ("The hallmark of the Eighth Amendment is that the sentencer be allowed to consider any mitigation that the defendant proffers."). It does not require that a jury be presented with all possibly mitigating evidence in existence. *See Riley*, 248 Ariz. at 200 ¶ 195; *Roscoe*, 184 Ariz. at 499–500; *cf. Kemp*, 483 U.S. at 794–95. In practice, such a requirement would be unruly and nearly impossible to comply with, even with a cooperative defendant. We decline to overrule our precedent holding a defendant may waive the presentation of mitigation because Montoya has failed to demonstrate that the cases are "clearly erroneous or manifestly wrong." *See Laurence v. Salt River Project Agric. Improvement & Power Dist.*, 255 Ariz. 95, 100 ¶ 17 (2023) (quoting *State v. Agueda*, 253 Ariz. 388, 391–92 ¶ 20 (2022)); *see also State v. Johnson*, 401 S.W.3d 1, 15 & n.8 (Tenn. 2013) (noting "a greater number of jurisdictions" have held the Eighth Amendment does not prevent a defendant from waiving the presentation of mitigation evidence).

**¶101**　　　　Here, Montoya's mitigation evidence waiver was only partial because he submitted the records of his guilty plea and mitigation waiver hearings as evidence of his acceptance of responsibility. The court found

Montoya's waiver to be knowing, voluntary, and intelligent after multiple colloquies and a competency evaluation, and Montoya does not dispute this finding. It is clear from the record that Montoya's waiver was sufficient. *See Riley*, 248 Ariz. at 201 ¶ 201. Additionally, the court repeatedly instructed the jury on the definition of mitigation, to consider all mitigating evidence apparent from the record, and that the jury could find mitigation even though Montoya did not present mitigating evidence. Thus, the court did not violate Montoya's Eighth Amendment rights by permitting him to waive the presentation of some mitigation evidence.

2. Sixth Amendment challenge

¶102    Montoya argues the court's acceptance of his waiver of the presentation of most mitigation evidence deprived him of his Sixth Amendment right to the assistance of counsel. The Sixth Amendment guarantees criminal defendants the right to self-representation and to assistance of counsel. U.S. Const. amend. VI. Generally, a represented defendant's attorney oversees trial management, but some decisions, like "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal," are reserved for the defendant. *McCoy v. Louisiana*, 584 U.S. 414, 422 (2018).

¶103    For Montoya's argument to succeed, we must accept the proposition that a defendant relinquishes any influence over all decisions except the few that a defendant exercises exclusive control over—but the opposite is true. "The choice [between self-representation and the assistance of counsel] is not all or nothing: To gain assistance, a defendant need not surrender control entirely to counsel." *Id.* at 421. And an attorney's actions "may be determined or substantially influenced by the defendant's own statements or actions." *See Strickland v. Washington*, 466 U.S. 668, 691 (1984); *see also Weaver v. Massachusetts*, 582 U.S. 286, 295 (2017) (noting a defendant's right to conduct his own defense is "based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty").

¶104    As we have previously noted, the Supreme Court has discussed with approval defendants' waiver of the presentation of mitigation over their attorneys' objections. *See Blystone*, 494 U.S. at 306–08 & n.4; *Landrigan*, 550 U.S. at 476, 481. Moreover, we have previously

rejected the argument that "the Sixth Amendment requires the defense to present mitigation despite the defendant's waiver." *State v. Hausner*, 230 Ariz. 60, 85 ¶ 119 (2012); *see also Roscoe*, 184 Ariz. at 499 (holding a defendant's decision to not present mitigating evidence is a "personal decision . . . within his discretion" and does not result "in ineffective assistance or an invalid waiver of counsel"); *State v. Kayer*, 194 Ariz. 423, 437 ¶ 46 (1999) (holding a defendant is allowed "not to cooperate with a mitigation specialist and thereby potentially limit the mitigation evidence that is offered"). In fact, "requiring the defense to present mitigating evidence over the defendant's opposition arguably would conflict with the defendant's Sixth Amendment right to self-representation." *Hausner*, 230 Ariz. at 85 ¶ 119; *see also Kayer*, 194 Ariz. at 436–37 ¶ 45 ("An anomaly would exist were we to accept defendant's argument that counsel exclusively controls the presentation of all mitigation evidence: a defendant could waive counsel at sentencing and thereby have exclusive control over the presentation of all mitigation evidence; yet if a defendant accepts counsel, he would have no input on what mitigating factors to offer.").

¶105 Montoya also argues that permitting a represented defendant to waive the presentation of mitigation evidence creates an appearance of unfairness that outweighs the defendant's right to control his own defense. For this proposition, he relies on *Indiana v. Edwards*, 554 U.S. 164, 174–78 (2008), where the Supreme Court held a state may require an incompetent defendant to be represented by counsel over his objection for many reasons, including that holding otherwise would undermine the appearance of fairness in judicial proceedings. *Edwards* is inapposite to a competent defendant's right to waive the presentation of mitigation. As we have discussed, a competent defendant may waive many rights, including the right to present mitigation evidence. *See Blystone*, 494 U.S. at 306–08 & n.4; *Landrigan*, 550 U.S. at 476, 481; *Hausner*, 230 Ariz. at 85 ¶ 119; *Roscoe*, 184 Ariz. at 499; *Kayer*, 194 Ariz. at 437 ¶ 46. Any appearance of unfairness that arises from such waiver by a competent defendant is so minimal that it does not justify categorically denying defendants their constitutional right to do so.

¶106 Montoya asks us to overrule our precedent, but we decline to do so because, again, he has failed to demonstrate that the cases are "clearly erroneous or manifestly wrong." *See Laurence*, 255 Ariz. at 100 ¶ 17 (quoting *Agueda*, 253 Ariz. at 391–92 ¶ 20); *see also State v. Arguelles*, 63 P.3d

731, 753 ¶ 82 (Utah 2003) (noting the "vast majority of courts" have concluded "that a defendant's Sixth Amendment right to represent himself and control the course of the proceedings carries with it the right to choose how much—if any—mitigating evidence is offered").

¶107        Here, Montoya knowingly, intelligently, and voluntarily waived the presentation of mitigation evidence, except for evidence that supported a finding of his acceptance of responsibility.  The Sixth Amendment did not require his attorneys to admit mitigation evidence over his objection.  His attorneys cross-examined witnesses and asked the jury to find numerous mitigating circumstances in closing argument.  Thus, the court did not deprive Montoya of his Sixth Amendment right to the assistance of counsel by accepting his partial waiver of the presentation of mitigation.

**F. Scope Of Victim Impact Statements**

¶108        Montoya argues the victim impact statements offered impermissible opinions and characterizations about Montoya and the crime in violation of the Eighth Amendment.  Because Montoya did not object to any portion of the victim impact statements, we review their admission for fundamental error.  *See Henderson*, 210 Ariz. at 567 ¶ 19.

¶109        Victims have the right to be heard at sentencing proceedings. Ariz. Const. art. 2, § 2.1(A)(4).  The Eighth Amendment does not prohibit the admission of relevant victim impact statements "relating to the victim and the impact of the victim's death on the victim's family" during the sentencing phase of a capital trial.  *Payne*, 501 U.S. at 827, 830 n.2.  However, "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment."  *Id.*; *see also Booth v. Maryland*, 482 U.S. 496, 508–09 (1987), *overruled in part by Payne*, 501 U.S. at 830 n.2. Additionally, the Fourteenth Amendment prohibits the introduction of a victim impact statement "that is so unduly prejudicial that it renders the trial fundamentally unfair."  *Payne*, 501 U.S. at 825.

¶110        At the outset, we note that, despite the State's offer to make the victim impact statements available, the judge declined to review the statements before they were presented to the jury.  We have cautioned

prosecutors and courts to "exercise restraint when presenting this type of victim impact evidence." *Burns*, 237 Ariz. at 30 ¶ 141. We do so again today. We emphasize that "a trial judge must take an active role in reviewing victim impact evidence to screen for potential unfair prejudice." *Id.* ¶ 139. By taking on this active role, judges contribute to the fair and efficient administration of justice in the Arizona court system.

¶111 Here, the court did not abuse its discretion in admitting most portions of the victim impact statements about which Montoya complains. The victim's statements that Montoya seemed like "the only person remembered" and focused on in court and that the victims refused to say Montoya's name or acknowledge him after he took A.R.'s dignity, did not offer characterizations or opinions about Montoya. Instead, these statements permissibly explained the grief, confusion, and anger A.R.'s family experienced after her death.

¶112 Additionally, most of the victim impact statements' references to the crime itself were to undisputed facts, and therefore not impermissible characterizations or opinions about the crime. It was not disputed that A.R.'s body was initially unable to be identified due to her decomposition, that Montoya threatened A.R. with a hammer and killed one of her dogs around the time of her death, and that her belongings went missing (due to Montoya stealing them) after her death. *See State v. Bush*, 244 Ariz. 575, 593–94 ¶¶ 78, 82 (2018) (finding a victim impact statement describing how the victim "was shot at close range, like she was worth nothing" and "[c]lose enough to almost blow her face completely off" permissible (alteration in original) (internal quotation mark omitted)); *Burns*, 237 Ariz. at 30 ¶ 141 (finding a victim impact statement speculating how the "victim may have felt during the crime" permissible). These references spoke to the victims' understanding of the crime and provided a foundation for the impact it had on them.

¶113 However, the court abused its discretion in admitting the portions of the victim impact statements that characterized Montoya as "the worst kind of person" and a "bad guy" and the crime itself as "[s]imply gruesome" and "brutal." Unlike previous factual statements that we have approved, *see State v. Rose*, 231 Ariz. 500, 513 ¶ 57 (2013) (finding victim impact statement referring to defendant as a "cop killer" permissible); *Cota*, 229 Ariz. at 150 ¶¶ 71–72 (finding victim impact statement referring to

victim's body as "mutilated" and "tortured" permissible), these descriptors amounted to impermissible opinions. Although these parts of the victim impact statements were impermissible under the Eighth Amendment, we find no fundamental error because Montoya cannot demonstrate that he was prejudiced by the statements in light of the strong aggravation evidence and limited mitigation offered by Montoya, the fleeting nature of the impermissible statements, and the court's jury instruction to only consider the victim impact statements insofar as they rebutted mitigation. *See Rose*, 231 Ariz. at 513 ¶ 57.

## G. Section 13-751(F)(6) Aggravator Jury Instruction

¶114　　　Montoya argues the jury instruction on the (F)(6) aggravator was incomplete because it provided definitions for especially cruel and especially heinous but did not explicitly state that the aggravator could be counted only once. He argues the allegedly incomplete instruction permitted the jury to impermissibly count the aggravator twice in violation of his rights to due process and to be free from arbitrary and capricious punishment. The jury instructions stated, in relevant part:

> [T]he Defendant admitted to the existence of the following two aggravating circumstances that make the Defendant eligible for the death penalty: (1) the murder was committed in an especially cruel or heinous manner; and (2) the defendant has been convicted of a serious offense. You must accept his admission.
>
> "Especially" means "unusually great or significant."
>
> The term "especially cruel" focuses on the victim's pain and suffering. The defendant admitted that the murder was committed in an "especially cruel" manner and that the victim consciously suffered physical or mental pain, distress or anguish prior to death, and the defendant knew or should have known that the victim would suffer.
>
> "Especially heinous" is used to describe the defendant's state of mind by looking to the defendant's words and actions at or near the time of the offense. A murder is especially heinous if it is hatefully or shockingly evil, in other words, grossly bad. The defendant admitted the murder was especially heinous

43

and that he exhibited such a mental state at the time of the killing by inflicting gratuitous violence on the victim beyond that necessary to kill. The defendant "inflicted gratuitous violence" by intentionally inflicting violence clearly beyond what was necessary to kill the victim, and that the defendant continued to inflict this violence after the defendant knew or should have known that the defendant had inflicted a fatal injury.

"A serious offense," as referred to in these instructions, includes the offenses of burglary, kidnapping, and aggravated assault.

¶115        We review whether jury instructions adequately stated the law de novo. *State v. McCray*, 218 Ariz. 252, 258 ¶ 25 (2008). "We consider the jury instructions as a whole to determine whether the jury received the information necessary to arrive at a legally correct decision." *Dann*, 220 Ariz. at 363 ¶ 51. Because Montoya did not object to the jury instructions, we review any error for fundamental error. *State v. Fierro*, 254 Ariz. 35, 41 ¶ 20 (2022).

¶116        The (F)(6) aggravator may be counted only once, but a finding of two or all of the (F)(6) factors may increase the strength of the aggravator. *Miller*, 186 Ariz. at 327. Here, the jury instruction was adequate. It explicitly stated that Montoya had admitted to two—not three—aggravating circumstances. The jury instruction also numbered out the aggravators, lumping especially cruel and heinous together: "(1) the murder was committed in an especially cruel or heinous manner; and (2) the defendant has been convicted of a serious offense." A layperson would understand the instruction to mean that Montoya's admission to murdering A.R. in an especially cruel and heinous manner amounted to a single aggravator. Thus, we conclude that the jury instruction adequately stated the law.

¶117        Additionally, the prosecutor repeatedly reminded jurors that especially cruel and especially heinous were two prongs of a single aggravator. Specifically, the prosecutor stated: "Please remember that just because there are two components of this aggravator proven does not mean this constitutes more than one aggravating factor. This is just one aggravating factor. However, you can consider that both especially cruel

44

and heinous are proven while determining the value that you give to that one aggravating factor when you deliberate." Later, the prosecutor reiterated: "Again, we're still talking about one aggravating factor. There's just two components, the cruelty and the heinousness." This averted any confusion that the definitions of "especially," "especially cruel," and "especially heinous" might have otherwise engendered. "Appellate courts do not evaluate jury instructions out of context. Closing arguments of counsel may be taken into account when assessing the adequacy of jury instructions." *State v. Bruggeman*, 161 Ariz. 508, 510 (App. 1989) (internal citation omitted); *see also State v. Felix*, 237 Ariz. 280, 285 ¶ 18 (App. 2015) ("[A]lthough 'arguments of counsel generally carry less weight with a jury than do instructions from the court,' in some trials, the arguments of counsel can cure or obviate instructional ambiguity or error." (citations omitted)). Accordingly, there was no fundamental error.

## H. Montoya's Non-Capital Guilty Pleas

**¶118** Montoya argues that his guilty pleas to the non-capital counts were not knowing, intelligent, and voluntary because the court did not inform him that, by pleading guilty, he would be waiving his Sixth Amendment right for post-conviction counsel to raise any ineffective assistance of counsel claims. Because Montoya did not object below, we review for fundamental error. *See Henderson*, 210 Ariz. at 567 ¶ 19.

**¶119** Montoya's argument is premised on the incorrect assumption that he does not have a right to post-conviction counsel. We "will not resolve an ineffective assistance of counsel claim on direct appeal unless the record clearly indicates that the claim is meritless." *State v. Maturana*, 180 Ariz. 126, 133 (1994). But if we affirm a pleading capital defendant's death sentence, the defendant may pursue Rule 32 post-conviction relief. Ariz. R. Crim. P. 32.1; Ariz. R. Crim. P. 32.3(c). Ineffective assistance of counsel is a ground for relief under Rule 32. Ariz. R. Crim. P. 32.1(a) & cmt. In a Rule 32 post-conviction proceeding, a defendant may argue ineffective assistance of counsel with regards to both his trial and appellate counsel. Arizona statute and court rules require a court to appoint counsel to an indigent pleading capital defendant for his or her first petition for Rule 32 post-conviction relief. A.R.S. § 13-4041(B), (E); Ariz. R. Crim. P. 32.5(b).

¶120        Thus, Montoya has a right to counsel in his first post-conviction proceeding, and his counsel can raise an ineffective assistance of counsel claim there.  For this reason, his argument that the court failed to inform him that, by pleading guilty, he would be waiving his right to counsel, fails.

¶121        Montoya also argues that the court erred in advising him that, in pleading guilty, he waived his right to directly appeal his non-capital matters and that, if he wished to seek post-conviction relief, he was required to file for relief within ninety days.  Only defendants who plead guilty in non-capital cases waive their right to direct appeal.  Ariz. R. Crim. P. 17.1(e).  Because Montoya was sentenced to death, he possessed an automatic right of direct appeal for the non-capital matters in his case.  Ariz. R. Crim. P. 31.2(b); Ariz. R. Crim. P. 32.4(b)(3)(C); *State v. Ovante*, 231 Ariz. 180, 184 ¶ 10 (2013) (stating that, if a defendant pleads guilty to capital and non-capital crimes in the same case, this Court will review the validity of the non-capital guilty plea on direct appeal).  Thus, the court erred by telling Montoya that he waived his right to direct appeal.  Nonetheless, after he was sentenced to death, the court informed Montoya through a written notice of his automatic right to direct appeal on all convictions and judgments to this Court, his right to post-conviction relief if this Court affirmed his convictions, and his right to representation in both proceedings.  Montoya has since, evidenced by this appeal, exercised his right to direct appeal and representation on direct appeal.  Montoya cannot show that he was prejudiced by possessing, and actually exercising, more rights than he thought would be available to him at the time of his guilty plea.  Accordingly, the court's error was not fundamental.

## I. Independent Review Of Jury's Verdict

¶122        We independently review the propriety of a death sentence, even if the defendant does not raise the issue.  A.R.S. § 13-756(A); *Allen*, 253 Ariz. at 363–64 ¶ 224.  In our independent review, we "review the jury's finding of aggravating circumstances and the imposition of a death sentence for abuse of discretion, viewing the facts in the light most favorable to sustaining the verdict."  *Allen*, 253 Ariz. at 363–64 ¶ 224 (internal quotation mark omitted) (quoting *State v. Gunches*, 240 Ariz. 198, 207 ¶ 41 (2016)).  We "will not reverse the jury's decision so long as any reasonable jury could have concluded that the mitigation established by the

defendant was not sufficiently substantial to call for leniency." *Id.* at 364 ¶ 224 (quoting *Morris*, 215 Ariz. at 341 ¶ 81).

**¶123** Here, a reasonable jury could have returned a death verdict for Montoya's murder of A.R. Montoya admitted guilt to first degree murder and two capital aggravators: his prior serious convictions and that he murdered A.R. in an especially cruel and heinous manner. The mitigating circumstances that Montoya argued—acceptance of responsibility, waiver of the presentation of mitigation evidence, personal and family history of substance abuse, abandonment, good behavior while in prison, and having a daughter—were relatively insubstantial. This is especially true considering the State's argument that these mitigating circumstances deserved little weight in light of Montoya's initial denial of responsibility for his murder of A.R. and his abandonment of his own daughter. Thus, the jury did not abuse its discretion by returning a death verdict.

### J. Issues Preserved For Federal Review

**¶124** Montoya seeks to preserve nineteen issues for federal review. We decline to revisit these previously rejected arguments.

### CONCLUSION

**¶125** We affirm Montoya's conviction for first degree murder and the imposition of the death sentence for his murder of A.R. We also affirm his convictions and sentences for second degree burglary, kidnapping, aggravated identity theft, unlawful use of means of transportation, theft, and two counts of animal cruelty.